[Civ. No. 430. Third Appellate District.—January 11, 1908.]

## JOHN CERINI, Plaintiff, v. D. M. DE LONG et al., Commissioners, etc., Defendants.

COUNTIES—ACT FIXING BOUNDARY LINES—ELECTION—MINISTERIAL FUNCTIONS OF COMMISSIONERS.—Under the act of March 14, 1907, fixing the boundary lines between the counties of Kings and Fresno, the functions of the commissioners appointed to give notice of an election held thereunder, and to canvass thereof, are purely ministerial and they have no judicial power under the act, and cannot go behind the returns for any purpose.

ID.—REFUSAL TO CANVASS RETURNS—FAILURE OF CLERK AS TO CERTIFICATE OF REGISTRATION—NEW ELECTION—VOID JUDICIAL ACTION.—

Where the county clerk of Fresno county had certified additional registration within forty days of the election, the refusal of the commissioner to canvass the returns for his failure to certify additional registration to the date of the election, and their declaration that the election was void on that ground, and the ordering of a new election, was judicial action in excess of the power of the commissioners.

ID.—PROPER CERTIFICATE OF CLERK—GENERAL LAW AS TO REGISTRATION APPLICABLE.—Where the act of March 14, 1907, prescribes that, except as otherwise provided therein, the general election law shall control, the registration of voters must be controlled by the general law, and the certificate made by the clerk as to additional registration within forty days prior to the election was proper under the law.

ID.—REMEDY BY MANDAMUS TO COMMISSIONERS.—The proper remedy for the refusal of the commissioners to canvass the returns of the election held under the act is by *mandamus* to compel the proper exercise of their ministerial functions thereunder.

ID.—REMEDY IN EQUITY FOR JUDICIAL WRONG.—No remedy by contest being provided for in the statute, if any judicial wrong has been committed in the conduct of the election, the superior court may, in the exercise of its equity powers, remedy such judicial wrong.

APPLICATION for *mandamus* to commissioners under the act of March 14, 1907.

The facts are stated in the opinion of the court.

M. K. Harris, Cartwright & Cashin, and Southerland & Barbour, for Plaintiff.

Charles G. Lamberson, for Defendants.

CHIPMAN, P. J.—*Mandamus.* The petition alleges the following facts: That petitioner is a qualified elector of the territory described in section 1 of the act approved March 14, 1907 (Stats. 1907, p. 260), relating to the establishment of the boundary line between the counties of Kings and Fresno; that defendants are the duly appointed and qualified commissioners to carry out the provisions of said act; that pursuant to said act said commissioners duly ordered and gave notice of an election to be held within said territory, and each precinct thereof, on December 10, 1907; that said election was so held on said day "and thereafter the election returns

from the officers of the said several precincts established by said board in said territory, authenticated as required by law, were all duly made to said board at its office established by it in the city of Coalinga within the said territory''; that on the seventeenth day of December, 1907, and after said returns had been so made and received by said board, all the members thereof met as a board of canvassers, at its said office, for the purpose of canvassing the returns of said election, as required by said act. ''That the said board, wholly disregarding the duty imposed upon it by law in the premises, expressly refused, and does now refuse, to canvass the said returns made by the officers of said election, or to certify the results thereof, but, on the contrary, by resolution then and there adopted, declared the said election and all proceedings taken in the various precincts of said territory in relation thereto to be void, and ordered that an election be called to be held in all of the precincts so established by said board in said territory on the fourteenth day of January, 1908; and your petitioner alleges that said board does not intend to, and will not, canvass the election returns heretofore made to it, and will not certify the results thereof as required by law or at all.''

The resolution last above referred to was as follows: ''It is ordered that the said election held in the various precincts in said district described in said act, on the tenth day of December, 1907, was not in truth, or in fact, or in contemplation of law, such an election as provided for by said act, and that the same is void, and that all the proceedings taken in the various precincts of said district in relation to holding an election on the tenth day of December, 1907, are hereby set aside.'' Then follows a further order calling another election for January 14, 1908, and directing the secretary of the board to demand of the county clerk a certificate showing the names of all qualified electors residing in said district ''prior to three months before said time for said election, who have been duly registered upon the great register of said county prior to the time set for said election.'' This resolution is preceded by numerous whereases reciting some of the provisions of the act, the steps taken under it by the board, the failure of the county clerk to furnish the board a certificate showing the registration of certain qualified voters and some other alleged facts. But these recitals are not before us as

admitted facts, and cannot be considered at this time as bearing upon the sufficiency of the petition.

A general demurrer to the petition was interposed for insufficiency of facts and a special demurrer on the ground that the petition is ambiguous for the reason that it does not appear therefrom "whether or not the county clerk of Fresno county furnished to the said commissioners a certificate, under seal, showing the additional names of the voters on the great register of the county of Fresno registered as residing in the said territory described in said act mentioned in said petition, since the last great register of Fresno county was printed and up to the tenth day of December, 1907, as provided by section three of said act." Three of the defendants filed an answer to the petition and to this the plaintiff inter-- posed a general demurrer. Both demurrers were argued and submitted and are now to be disposed of. Two of the defendants admitted the truth of the averments of the petition and expressed a readiness to proceed with the canvass.

### THE DEMURRER TO THE PETITION.

The act under which the election was authorized provides for the appointment by the governor of five persons "who shall be and constitute a board of commissioners to carry out" its provisions. It points out how the board is to organize, and provides that three of the members shall be necessary to transact business. It is made the duty of said board of commissioners, after they have duly organized, to divide the territory into not less than five nor more than nine election precincts where the elections are to be held; and provides that: "Said commissioners and the clerk elected by them are hereby authorized, empowered and required to discharge the same duties as are now required by law of boards of supervisors and county clerks . . . so far as the same apply to holding elections, canvassing the returns and certifying the results thereof; they shall keep a full record of their proceedings transmitting to the Secretary of State a certified copy thereof and filing the original, with the original election returns, in the office of the county clerk of the county of Fresno; and in case the qualified electors of said territory . . . shall vote in favor of such change as herein provided the said commissioners shall file a certified copy of all their proceedings and of said election returns with the county clerk of the

7 Cal. App.—26

county of Kings; and thereupon the powers and duties of said commissioners shall cease and terminate. . . . Said election shall be conducted in every respect, except as otherwise herein provided, in accordance with the general election law for the election of county and township officers. All qualified electors of this state who have been residents and electors in the said territory last herein described for ninety days preceding the election herein provided for shall be qualified to vote at said election. The great register of Fresno county used at the general election held in the year 1906 in the territory last above described shall be *prima facie* evidence of the qualification of electors; the county clerk of the county of Fresno is hereby directed to furnish said commissioners a certificate under seal, showing the additional names of the voters on the great register of the county of Fresno, registered as residing in said territory hereinbefore described, since the last great register of Fresno county was printed, and the certificate of the county clerk of Fresno county under seal, showing the registration of any qualified voter residing in the said territory prior to three months before such election shall entitle the holder thereof, if otherwise qualified by law, to vote at said election." The act then provides that if sixty per cent of the votes cast upon the question of annexation of said territory to Kings county shall be in favor of such annexation, the territory shall become a part of such county "from and after the day upon which the returns of said election shall be ascertained and declared by said board of commissioners." The act also requires the officers of election precincts to make returns to said board within six days after the day of election.

The provisions of the Political Code to which, in canvassing the returns, the board must conform, are found in sections 1280 and 1281, and are as follows: "If at the time of the meeting, the returns from each precinct in the county in which polls were opened have been received, the board must then and there proceed to canvass the returns." (Sec. 1280.) "The canvass must be made public, and by opening the returns and estimating the vote of such county or township for each person voted for, and for and against each proposition voted upon at said election; and declaring the result thereof. . . ." (Sec. 1281.) Section 1261 of the same code designates the papers and documents which constitute the "re-

turns,'' so called, and which are to be sent to the clerk and upon them the ''canvass'' is to be made. These returns consist of ''the copy of the register upon which one of the judges marked the word 'voted' as the ballots were received, all certificates of registration received by it, one of the lists of persons challenged, one copy of the list of voters, and one of the tally lists and list attached thereto.'' (Sec. 1261.) The ballots are to be delivered to the clerk and are not to be opened, but must be kept sealed as provided in section 1264.

There are certain well-established rules of law which may be stated in this sequence, though bearing more appropriately upon the discussion arising under the demurrer to the answer. The board of canvassers (commissioners here) have no judicial power, but act in a purely ministerial capacity, their duty being only to cast up the votes and make their award in accordance with the result thus ascertained. (*Calaveras County* v. *Brockway,* 30 Cal. 326; *People* v. *Stewart,* 132 Cal. 283, [64 Pac. 285]; *Davis* v. *Grunig,* 143 Cal. 336, [76 Pac. 1102]; *Borchard* v. *Supervisors,* 144 Cal. 10, 17, [77 Pac. 708]; *Gibson* v. *Twaddle,* 1 Cal. App. 126, [81 Pac. 727]; McCrary on Elections, 4th ed., sec. 261.) Speaking of the rule, Judge McCrary says: ''But of course it does not follow from this doctrine that canvassing and return judges must receive and count whatever purports to be a return, whether it bears upon its face sufficient proof that it is such or not. The true rule is this: they must receive and count the votes as shown by the returns, *and they cannot go behind the returns for any purpose* (Italics his), and this necessarily implies that if a paper is presented as a return, and there is a question as to whether it is a return or not, they must decide that question from what appears upon the face of the paper. Thus, in New York, it has been held that the duties of the canvassers were 'to attend at the proper office and calculate and ascertain the number of votes given at any election and certify the same to be a true canvass; this is not a judicial act, but purely ministerial; they have no power to controvert the votes of electors.' '' (*Ibid.,* sec. 262.) In *People* v. *Head,* 25 Ill. 325, 328, the court said: ''They may probably judge whether the returns are in due form, but after that they can only compute the votes for the several candidates and declare the result''; and in *Lawrence* v. *Schmaulhausen,* 123 Ill. 321, [14 N. E. 255], it was held that

a canvassing board should reject the return made by the judges of election if not accompanied by the certificate required by statute. But as to this Judge McCrary says: "In determining the form of the returns they must consider the substance, and not be too technical. If there is substantial compliance with the law it is enough." In a sense the power to determine whether the papers transmitted to the canvassing board are genuine election returns, duly signed and authenticated, is judicial or *quasi* judicial, but the general rule is not impaired by conceding such limited powers to the canvassing officers. In *Sweeny* v. *Adams*, 141 Cal. 558, 561, [75 Pac. 182, 183], the court said: "It is from the face of these returns, and from no other data, that the canvassing board declares who is elected." *Mandamus* is the proper remedy to compel the canvassing officers to discharge their duties. (McCrary on Elections, sec. 385; *Pacheco* v. *Beck*, 52 Cal. 3; Code Civ. Proc., sec. 1087.)

It appears from the petition that the board of commissioners authorized by the act was duly organized; that pursuant to the act of the legislature notice of the election was duly given; that the election was held pursuant to the act and the returns thereof from the officers of all the precincts were duly returned, authenticated as required by law and made to the board of canvassers; that upon their receipt by the board it met to canvass the same, but failed and refused to canvass said returns and declared the election void and ordered a new election.

It will be observed that the petition is silent as to whether or not the clerk of Fresno county furnished the certificate referred to in section 5 of the act, and this omission is made the ground of defendants' demurrer. It was urged by defendants at the hearing that the board refused to canvass the returns because the clerk failed to furnish this certificate; that this provision of the statute is mandatory and compliance therewith was jurisdictional, without which the board was powerless to proceed, and hence such fact should have been alleged in the petition; citing *People* v. *Castro*, 39 Cal. 65, 68, and other cases. The reasons impelling the board to refuse to canvass the returns are not now before us; we are to consider only the sufficiency of the facts as alleged in the petition. The action in *People* v. *Castro* was to collect a special school tax levied for the purpose of erecting a schoolhouse in

a certain school district. A demurrer to the complaint was overruled and the cause went to trial on the issues of fact presented by the complaint and answer. On the appeal it was held that the demurrer to the complaint should have been sustained. It does not appear what facts were alleged in the complaint. The attorney general, Hamilton, in his brief in support of the complaint, with characteristic humor, confessed that the complaint gave "marked evidences of a cheerful and contented disregard of rules and precedents" in pleading. It is to be inferred from the opinion of the court that there was a failure, among others, to allege that an election had been held authorizing the tax levy. The court said: "There was no power to levy the tax, except on a vote of the electors, had in the prescribed method; and the holding of such an election was a jurisdictional fact, lying at the foundation of the proceeding. It was a fact on which the defendant was entitled to take issue, and, if denied, must be proved. It was, therefore, necessary to aver it with precision and in such manner as to admit of a direct issue upon the facts averred. The complaint is wholly defective in this respect, and presents no issuable facts touching the election."

The act here before us made the great register for 1906 evidence as to who were entitled to vote at the election and also directed the county clerk to furnish a certificate "showing the additional names of the voters on the great register . . . since the last great register of Fresno county was printed." The act also made it the duty of the Secretary of State to furnish the board the requisite quantity of ballot paper for use at said election. We shall have occasion more particularly to inquire into the meaning of the act when we come to consider the demurrer to the answer. The powers of the board as well as the duty of the county clerk are there more appropriately brought under review. We do not think that the petition is fatally defective because it fails to state that the clerk performed his duty in the matter referred to, any more than because it fails to state that the Secretary of State performed his duty in supplying ballot paper. The statute made the great register of 1906 *prima facie* evidence of the qualification of electors and imposed no duty upon the clerk to furnish certified copies of this register. We cannot assume that there were any additional names of voters registered after the printing of the last great register, and we may presume official

duty performed. It was made mandatory upon the county clerk to furnish the names contemplated by the statute, if there were any, and he could have been compelled by *mandamus* to do so, and in that sense the duty placed upon the clerk is mandatory. We do not think, however, that its performance was so far jurisdictional to the action taken in ordering the election or in conducting the election, or in canvassing the returns that the facts should have been alleged in the petition as a necessary prerequisite to granting the relief now sought.

### DEMURRER TO THE ANSWER.

The issues presented by the answer were at the argument conceded to relate to the alleged failure of the county clerk to perform the duty devolved upon him by the act. There is a denial, it is true, that there was any election held or any returns of any election sent to or received by the board, but in the argument these averments were taken rather as alleging the legal effect of what took place than what in fact occurred. The real issues upon which we are asked to place our decision are found in what is called the separate answer and defense of defendants. These allegations in substance are: That upon calling the election the board directed its clerk to demand of the county clerk of Fresno county a certificate, under seal, showing the additional names of the voters on the great register since the last great register was printed; that such demand was made, and refused by the said county clerk, except that he did furnish such certificates "showing the additional names of the voters . . . up to within forty days prior to the holding of said election, but . . . refused to furnish any certificate . . . showing such additional names of voters . . . registered as residing in the said territory at any time within forty days prior to the said election." It is alleged upon information and belief that "upwards of three hundred qualified electors of this state, who had been residents and electors of the said territory . . . for ninety days preceding the tenth day of December, 1907, which said names and the whole number thereof, the said county clerk refused to place in any certificate given to these defendants under the seal of said clerk"; that said number of qualified electors was by said illegal action of said clerk deprived of the right to vote at said election, and that had

they been permitted to vote ''the result of said election would and might have been changed.'' It is then alleged that the board met on December 17, 1907, to canvass the returns of any election that had been held on December 10th and in pursuance of its duty the said board ''did open the returns which were supposed to have been made by the officer of election at Pleasant Valley precinct . . . and ascertained from an inspection of such supposed returns that one hundred and seventeen persons had been permitted to vote at said precinct without being upon any list of voters certified by the county clerk of Fresno county, under seal, and without producing or showing any certificate of the county clerk of Fresno county, under seal, showing the registration of any qualified voter residing in said territory prior to three months before such election, as is provided by section 3 of the said act of the legislature referred to in the petition herein, and thereupon these defendants suspended further canvassing of the returns made by the officers of said alleged election, and passed a resolution, a copy of which is hereunto attached . . . , and these defendants allege that all the statements contained in said resolution were, and are true, and that no election was in truth and in fact held in the said district on the tenth day of December, 1907.'' The answer then shows that the board has ordered a new election. The resolution referred to recites that the board called an election to be held December 10, 1907, pursuant to the act; sets forth the provisions of section 3 of the act; the refusal of the county clerk to furnish the certificate hereinbefore mentioned, and that by reason of such failure on his part many voters were deprived of the right to vote; that ''a large number of voters who had been registered on the great register of the county of Fresno prior to the said election were allowed to vote . . . without producing any certificate of the county clerk of Fresno county under seal, as provided by said act''; that the failure ''of the county clerk to perform his duty under said act as herein recited and the action of the boards of election in receiving the votes of electors without the certificate of said county clerk, under seal, might have changed the result of said election had the law . . . been properly complied with; now, therefore, it is ordered,'' etc. This order has been set forth above.

It seems to us that in pursuing the course thus taken by the canvassing board it acted in a judicial capacity and in excess of its power as such board. The answer shows that the county clerk did make the certificate required by him by the statute except as to registrations made "within forty days prior to the holding of said election." It was his construction of the act that the general law (Pol. Code, sec. 1094) governed in the matter of registration. It reads: ". . . Such registration shall begin on the first day of January of such years, and shall be in progress at all times except during the forty days immediately preceding any election, when it shall cease as to electors residing in the territory within which such election is to be held; . . ." The board contended, as was stated at the hearing, that it was the duty of the county clerk to certify as to all registrations made up to the day of the election, under the provision of the act which reads: "All qualified electors of this state who have been residents and electors of the said territory last herein described for ninety days preceding the election herein provided for shall be qualified to vote at said election." We are satisfied from a careful examination of the act that the construction given it by the county clerk is correct. The act does not require the county clerk to register voters up to a date nearer to the election than is required under the general election law and no mode of registration different from that thus provided is to be found in the act. The county clerk is not directed to register voters up to the day of the election, nor is he directed to deviate from the directions found in the general election law, which declares that registration shall cease at the beginning of the forty-day period prior to the election. The only variation from the provision of the general election law is that all persons are entitled to vote, if otherwise legally qualified, who have resided in the territory three months before the election, omitting the requirement of residence in the precinct not less than thirty days. The commissioners are authorized to discharge the same duties as are required by law of boards of supervisors "so far as the same apply to holding elections, canvassing returns and certifying the result." Furthermore, "said election is to be conducted in every respect, except as otherwise herein provided, in accordance with the general election law for the election of county and township officers." The mean-

ing is plain that, except as otherwise provided in the act, the election is to be held under the general election law and the commissioners are given the same duties and the same powers as boards of supervisors acting under the general election law. We must read into the act the provisions of the general election law and give full effect thereto except as otherwise provided in the act itself. Among the provisions of the general law is section 1094 of the Political Code, *supra,* which provides that registration shall cease "during the forty days immediately preceding any election." We find nothing in the act inconsistent with this provision, and every reason for embodying it in the general law applies with equal force to the act in question. The period when, before the election, registration shall cease has been by the policy of the law made progressive toward placing impediments in the way of fraudulent colonization of voters. Formerly the period was fifteen days; it was afterward extended to thirty, and in more recent years to forty days. The period was probably extended, also, to give the county clerk more time in which to print and distribute the great register. It is within judicial cognizance that the old plan of printing the great register has been done away with and that part of the act referring to the great register must be dealt with in view of this fact. The county clerk now binds the original affidavits into books and prepares printed indexes thereof, sending out the certified books of affidavits, with not less than five indexes to each precinct. This was done by the county clerk, showing all registrations up to the time when the law directed registrations to cease so far as concerned this particular election. The construction of the act urged at the argument, apart from what has been said, would impose upon the county clerk a duty hardly within his physical power to perform, aside from its violating the policy of the law as to preventing the stuffing of precincts by floating and irresponsible voters. Many of the precincts were so remote from the county seat as to have made it difficult if not impossible to have furnished the certificate mentioned in the statute covering registrations up to the morning of the election, and yet it is contended that because this was not done the commissioners were authorized to declare the election, if subsequently held, to be void and order a new election. We cannot bring ourselves

to believe that any such construction can reasonably be given to the act.

But whether or not we are right in this view, we do not think the board had power to pass upon this question and make its decision the basis for refusing to canvass the returns and declaring the entire election to be void. It seems that the board reached its conclusion upon the examination of the returns of a single precinct (the Pleasant Valley precinct), and thereupon refused to make any canvass. There is no pretense that the returns were not in due form and duly authenticated. The board must have considered facts not appearing upon the face of the returns in passing upon the question; and this they could not do. Besides, if they found justifiable reason for rejecting the returns from Pleasant Valley precinct they had no right to assume all other returns to be similarly affected and to reject them *en masse* without even opening or scanning them. Apparently the board proceeded upon the assumption that it had power to hear and determine, as would a court, all questions of law and fact arising out of the election and to declare the entire election void because, in the instance noted, they differed from the county clerk as to the true construction of the statute.

It is alleged in the answer that there were upward of three hundred electors in the district who had resided therein for ninety days prior to the day of election, "who were, by the said illegal action of the clerk of Fresno county, deprived of the right to vote at said election"; and that had they been permitted to vote, "the result of said election would and might have been changed." This alleged fact could not have been determined from an inspection of the return—certainly not from returns which concededly were not examined at all. But whether true or not, it was the function of some judicial tribunal to determine upon appropriate proceedings.

It was contended by defendants that the powers and duties of the board created by the act "were not entirely such as those conferred upon the board of supervisors of the county," sitting as a canvassing board; that there is no law providing for a contest of an election of this kind; that the action of the board of commissioners must in its nature be final, since there is no way of remedying the matter in court by contesting the election. It is true that the code provides

only for contesting the election of persons to office, but the failure to provide for a contest of such an election as we have here would not authorize the board of commissioners to exercise powers not given them by the act itself and no such power is there given. If the law furnished no remedy in such case through the regularly constituted courts, we must look to the legislature for relief; it would be intolerable to allow a board created with limited powers to erect itself into a court and assume to discharge all the functions of a court in an *ex parte,* not to say arbitrary, manner, as must necessarily be done in such a case as we have here.

But the courts are not thus impotent. The superior courts are endowed by the constitution with general equity powers and may, under its jurisdiction thus conferred, inquire into frauds, mistakes and cognate matters. If, in the exercise of this jurisdiction, no course of proceeding "be specially pointed out by the code or by the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this code." (Code Civ. Proc., sec. 187.) We have, too, the maxim of jurisprudence: "For every wrong there is a remedy." (Civ. Code, sec. 3523.) But that there are remedies in such case through the orderly course of proceedings in courts has been decided by our supreme court. *Calaveras* v. *Brockway,* 30 Cal. 325, is an example. The election there related to the removal of the county seat of Calaveras county to the town of San Andreas, and that town was duly chosen as the county seat and was so declared by the board of supervisors. The county officers refused to remove their offices to this newly chosen county seat or to recognize the legality of the act of the supervisors. The latter proceeded against these recalcitrant officers by *mandamus.* There was then no general law for contesting such an election and no contest was provided for in the special act except as to the election of some person to an office. It was held that while the determination of the board of supervisors was *prima facie* evidence of the fact so determined, it was open to contradiction, "and," said the court, "if the fact be otherwise than as determined by the board, it would be an unjust denial of the rights of the electors of the county to shut the door against all remedy for the redress of the wrong."

In *Gibson* v. *Board of Supervisors*, 80 Cal. 359, [22 Pac. 225], the election was to determine whether bonds should issue to raise funds for the purpose of building certain bridges. The board of supervisors declared the proposition lost. Plaintiff then brought the action against the board, averring the true facts about said election, and praying that the order of the board be annulled, that a true result of said election be declared, and for such other relief as equity deemed meet. It was urged there as here that no court, by any form of action or proceeding, legal or equitable, has any jurisdiction or authority to inquire into the result of an election on the question of issuing bonds (here changing county boundary lines); that the whole matter is beyond the scope of judicial investigation; that there can be a contest over the election to an office simply because the statute provides a procedure for such a contest; but that as there is no such procedure provided for a contest about any other kind of an election, and as the subject matter is in its nature beyond the cognizance of the courts, therefore there is no judicial jurisdiction of any kind to determine any question arising out of such an election. Said the court, speaking through Mr. Justice McFarland: "If that position be correct, then its consequences are far-reaching and alarming. . . . Suppose that interested parties should successfully contrive to have presented to the people of a county a proposition to issue bonds for an unworthy purpose and to a ruinous extent; and that, although the people really defeated the project at the polls, certain election officers, either through intentional fraud or by a gross mistake, refused to return a large number of votes in the negative, so that the returns would show the proposition to have carried, would there be no remedy— no power to execute the real will of the people? There certainly would be no such remedy in the hands of the supervisors; for they can only estimate the votes returned, and have no power to count the ballots. The will of the people then can be carried out by the courts, with their power to compel evidence and thoroughly investigate, or not at all." It is then pointed out that the constitution, section 18, article XI, has specially provided for an election to determine the policy of creating a bonded indebtedness and prohibited the issuance of bonds, without the consent of two-thirds of the voters of the county. Said the court: ",Whenever there is such a con-

stitutional provision, and no machinery provided by law for enforcing it, the constitution by necessary implication confers upon the court of chancery jurisdiction to protect and enforce the will of the people by suitable and proper procedure. This principle has been declared and followed in numerous cases where constitutions have provided for the removal of county seats; and we see no distinction, with respect to the point under discussion, between those cases and the one at bar.'' The constitution, article II, deals with the right of suffrage, the qualification of voters and elections by ballot in a way, it seems to us, to make applicable the principle discussed in the case just considered. So, also, does article XI, in its provisions with respect to creating new counties, removal of county seats and the recognition of the several counties as they now exist, as legal subdivisions of this state.

Without pursuing the argument further, we are satisfied that the writ should issue, and it is so ordered.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 10, 1908.